## DEVEREAUX v. CITY OF BROWNSVILLE.

## LOAGUE, Adm'r, v. TAXING DIST. OF BROWNSVILLE.

*(Circuit Court, W. D. Tennessee. January 25, 1887.)*

1. CONSTITUTIONAL LAW—OBLIGATION OF CONTRACT—MUNICIPAL CORPORATIONS —REPEAL OF CHARTERS—TAXATION TO PAY DEBTS OF EXTINCT MUNICIPALITIES.

If a municipal charter be repealed, and the same inhabitants and territory be reorganized into another corporation, the latter is the successor of the former, both in the corporate obligation to pay the existing debts, and those corporate powers of taxation conferred as a part of the remedy of the creditors; and any statutory prohibition of its exercise is void, under the inhibition of the federal constitution against impairing the obligation of contracts.

2. SAME SUBJECT—MANDAMUS AGAINST THE SUCCESSOR OF EXTINCT MUNICIPALITIES—JUDGMENTS AGAINST MUNICIPAL CORPORATIONS.

Those agencies, existing for the local government of a municipality, are bound to perform such duties as are necessary to enforce the taxing power, although not especially designated for that purpose, if there be a general grant of the power of taxation to the municipality itself. This duty is implied from the general grant, whether it be conferred directly by statute upon the particular municipality, or devolved upon it as the successor in corporate obligation through a grant to its predecessor. *Therefore* a *mandamus* will lie to enforce, by taxation, the payment of judgments against the original corporation, to be directed to the governmental agencies of the new corporation, they to proceed according to the general laws of the state governing the exercise of the taxing power by municipalities possessing the authority.

3. SAME SUBJECT—TAXING DISTRICTS OF TENNESSEE—CASE IN JUDGMENT.

Under the legislation of Tennessee, repealing municipal charters and reorganizing the inhabitants into taxing districts, contrived to compel creditors to accept a compromise of their debts at reduced amounts, the prohibitions of the exercise of the taxing power by the new local governments are void, so far as relates to those grants of that power to the old corporations, which enter into contracts as a part of the remedy of creditors; and the "taxing districts" may be compelled to exercise the power given by these original grants, by proceeding, according to the general tax laws of the state, to certify to the county court clerk the necessary rate to pay the judgment, to be extended upon the tax-books, and collected as other taxes are collected. It is not necessary that the particular officials to perform this duty shall be designated in the statute, but the general grant to the corporation implies that the officials governing the municipality shall perform it, and it will be enforced by *mandamus* against the new commissioners who take the place of the former mayor and aldermen.

4. SAME SUBJECT — SPECIAL SESSIONS OF LEGISLATURE—SUBJECTS OF LEGISLATION—GOVERNOR'S CALL AS A RESTRICTION OF LEGISLATIVE POWER — CONSTITUTION OF TENNESSEE OF 1870, ART. 3, § 9.

It was not the intention of the constitution of Tennessee to require the governor to define, in his call for an extra session of the legislature, the details of the subjects of the legislation desired, but only, in a general way, to confine the business to particular subjects. *Therefore* a call for legislation "to enable taxing districts to compromise their old debts" does not exclude legislation repealing former grants of taxing power to the taxing districts to pay those debts.

5. SCIRE FACIAS — REVIVOR OF JUDGMENTS AGAINST EXTINCT CORPORATIONS — SUGGESTION OF RECORD ONLY NECESSARY.

Revivor of a judgment against the successor of an extinct municipal corporation is accomplished by a mere suggestion of record. A *scire facias* is not necessary before a *mandamus* can issue against the new corporation organized in place of the old. The practice examined and stated in relation to the effect of the legislation of Tennessee creating "taxing districts" in place of municipal corporations whose charters have been repealed.

6. STATUTE OF LIMITATIONS—IMPLIED SUSPENSION—REPEAL OF MUNICIPAL CHARTER—STATUTORY OBSTRUCTION OF SUIT BY THE STATE—EQUITABLE DEFENSE TO MANDAMUS.

If the state, with the deliberate purpose of obstructing the creditor, repeal a municipal charter, whereby there is no organization to be sued, and the creditor be disabled from proceeding, the time of such obstruction will be excluded from the limitation of the statute, the legislative intention to suspend it being implied, as in case of war. Moreover, it may be set up as an equitable defense in proceedings by *mandamus.*

7. MANDAMUS—TO ENFORCE JUDGMENT—INADEQUATE LEVY.

Although the court will not compel, by *alias* writ of *mandamus,* any further levy of taxation until there has been an exhaustion of former levies, by pursuing all legal remedies against delinquent tax-payers, this rule does not apply if the state and the corporation abandon the former levies, and obstruct their operation by legislation and other acts intended to prevent the creditor from realizing them.

8. SAME SUBJECT—NUGATORY MANDAMUS—STATUTORY RECEIVER TO COLLECT TAXES—APPOINTMENT NOT COMPELLED.

If the governor of the state refuse to appoint a receiver authorized by statute to collect the taxes already levied by a municipal corporation whose charter has been repealed, the court will not undertake to compel an appointment by *mandamus,* because the writ will not be issued where it is likely to be nugatory, and cannot be enforced.

9. TAXATION—PERMANENT LEVIES.

Nothing less than an explicit declaration of the statute that a tax levy is intended to be continuing and permanent will effectuate that result. It will not be implied or established by construction of ambiguous language.

10. CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACTS—POWER OF LEGISLATURE TO REPEAL TAX LEVIES FOR MUNICIPAL PURPOSES.

Any taxes levied by the legislature for municipal purposes, or grants of power to a municipality to make such levies, may be repealed, if they be subsequent to the contract involved, as there is no protection under the federal constitution except for such powers of taxation as enter into and become a part of the contract itself, and belong as a remedy to the creditor.

11. SAME SUBJECT—TAXING DISTRICT OF BROWNSVILLE, TENNESSEE.

The legislation of Tennessee, in relation to the "town" and "city" and "taxing district" of Brownsville, examined; and *held,* that all special methods of taxation granted to that municipality have been repealed, that the corporation has been placed under the general tax laws of the state, and that it is to those laws the creditors must resort for the enforcement of their judgments, by *mandamus,* where they are entitled to that writ against the taxing district as the successor of the old corporation.

At Law. Petitions for *mandamus.*

*Myers & Sneed* and *Craft & Cooper,* for petitioners.

*Bond & Rutledge* and *Smith & Collier,* for defendants.

Before JACKSON and HAMMOND, JJ.

HAMMOND, J. Following a public policy, reviewed in its application to the city of Memphis in *Meriwether* v. *Garrett,* 102 U. S. 472, the legislature of Tennessee, in 1879, inaugurated a plan of relief for insolvent municipal corporations, whereby it was expected they could escape the payment of their debts, unless the creditors would accept the "settlements" tendered them under the provisions of the legislation. The general plan was to repeal the charters, so that there should be no officials or agencies liable to judicial compulsion by *mandamus;* then to supply other agencies of local government, invested with all the powers of the old municipalities, except the taxing power, which was not only with-

held, but conspicuously prohibited, to those new organizations, called "taxing districts." The taxes for carrying on the new contrivances were to be levied directly by the legislature itself upon the taxables within their boundaries, and, that body not being amenable to any judicial coercion by *mandamus*, it was believed that the creditors were wholly without remedy. The legislature then provided for a settlement with creditors upon the general basis of refunding the old indebtedness at the half, the amount at which the state "settles" or "compromises" its own indebtedness. The taxes to pay the interest and principal of the new bonds, like other taxes for municipal purposes, were to be levied directly by the legislature; but provision is made that, in default of such levy, the "taxing districts" may themselves levy the necessary tax. Acts 1883, *c.* 170, p. 224. This act applies to all "taxing districts," of whatever class, and by its twentieth section "repeals all laws, or parts of laws, in conflict herewith."

Under this legislation the supreme court of Tennessee has held that, by operation of the constitution of the United States, forbidding a state to pass laws impairing the obligation of contracts, these new "taxing districts" are simply the successors of the old corporations, so far as relates to the obligation to pay the indebtedness existing at the time of the repeal of the charters, and that creditors may proceed against them, as such successors, the obligation resting upon the inhabitants of the particular territory. *O'Connor* v. *Memphis*, 6 Lea, 730, 738, 739; *Luchrman* v. *Taxing Dist.*, 2 Lea, 425. The same doctrine is affirmed by the supreme court of the United States in *Mobile* v. *Watson*, 116 U. S. 289; S. C. 6 Sup. Ct. Rep. 398.

We have just held in *Loudon* v. *Taxing Dist.*, (no opinion,) the circuit and district judges on the bench, upon considerations entirely satisfactory to us, that it is the logical result of that principle, if it be not distinctly decided in the last-cited case, that any power of taxation, provided as a means of paying their debts, heretofore granted to the original municipalities, devolves as readily as the obligation to pay them, and by like operation of the federal constitution, upon those successors, notwithstanding the attempted statutory prohibition. That power was a grant to the inhabitants of the particular municipal territory, and not to the designated officials through whose agency it was exercised; and those inhabitants may, and must, exercise the power, so far as the old creditors are concerned, through any new agencies existing by law, and adapted to the work of levying and collecting taxes. As evidence of that adaptation, it may be remarked that the "taxing districts" are especially authorized to exercise all the essential powers of taxation to pay the new bonds, if the legislature neglects that duty; and it is particularly worthy of notice, in view of the argument made at the bar that a given agency of the municipal government must be designated and especially clothed by statute with the power to levy and collect taxes, before the general power, devolved as above mentioned, can be exercised, that by the twelfth section of this very act of 1883 the power is not so conferred upon any designated agency of the new municipal government, but only upon "every municipal cor-

poration or taxing district which compromises its debts," etc. The whole argument of the defendant was that no given agency of the new governments could exercise the taxing power, unless appointed by law to do so; yet this new legislation does not appoint any agency, but confers it in the most general terms, as did the old legislation, upon the municipality itself; that is, upon the inhabitants of that locality. This would seem to be a sufficient answer to the argument, for it can hardly be imagined that any further legislation is necessary to enforce this power in favor of the holders of the new bonds, if occasion should require it; and the *mandamus* would necessarily run against the legislative and administrative officers of the taxing districts, just as we are here asked to order it. That is to say, it is a necessary implication from the general grant of the taxing power that the officials of the municipality exercising other legislative duties would be required to perform this. We do not imply the grant of taxing power as a product of the federal constitution, nor create it by judicial judgment,—not at all; but we hold that the grant heretofore made to the inhabitants of the given territory has never been taken away; and that while the agencies have been changed, and the methods of taxation altered, other agencies and other methods have been provided upon which the law devolves the duty embodied in the general grant, just as it would devolve it upon these self-same agencies were the courts required to act upon the general grant of taxing power under this twelfth section of the act of 1883.

Nor is there any practical difficulty in the way. The former method of having the municipalities make separate assessments, and providing independent agencies for the collection of municipal taxes, has been long since abolished by general law. Now the state officials make, through the agency of the county courts, one general assessment, upon which all taxes are levied and collected. This is placed in the hands of the county clerk, and it is required "that cities and incorporated towns shall certify the rate of taxation levied by them to the clerk of the county court," and he extends them upon one tax-book, in appropriately designated columns, etc. Acts 1868, *c.* 102, § 2, p. 247; Acts 1875, *c.* 92, § 63, p. 159; Acts 1877, *c.* 73, § 6, p. 96; Id. § 8, p. 97; Acts 1881, *c.* 171, § 42, p. 255; Acts 1883, *c.* 105, § 42, p. 115.

Here, then, is adequate and complete machinery, provided by general law, for all municipal corporations possessing the general power of taxation, whereby they may effectually exercise it; and, given the general grant to a certain body of people, it is a mistake to suppose that they need to have a statutory appointment of named officials to exercise it. Those appointed for the general purposes of the local government of that body of inhabitants may exercise the power, as they do all governmental powers of that local character.

It is only necessary, then, that we require the officials of the new government to certify to the county court clerk that rate which the judgment itself shows is needed to satisfy it, upon the basis of an assessment already at hand; that the county court clerk extend that rate upon the tax-books; and that the other officials collect the tax so ascertained to be due from each tax-payer. It is a very simple process, and is the inevi-

table outcome of the decisions of the state and federal supreme courts already cited. Once grant the taxing power to a body of people incorporated for local government, as a part of the remedy given to holders of its bonds authorized by law, and it remains with them until the debt is paid, and may be exercised as long as any machinery of local government is provided for them. The entire destruction of the machinery in all its parts, and the relegation of the inhabitants to the general mass, might accomplish the intended purpose of this legislation; but, at the very moment that new agencies of incorporation and government are substituted for the old, the inexorable rule of justice comes into play under our constitution, and the existing obligations must be paid. The vociferous statutory prohibitions of this legislation are void, both as to the new corporations and their new agencies, so far as concerns the old indebtedness. The new machinery succeeds to and takes the place of the old, finding its powers of action in the old grants of the taxing power in precisely the same way that it finds the other elements of the contract obligation that cannot be impaired. Our general tax laws applicable to the whole state furnish conveniently the instrumentalities for the work of taxation, and there is no necessity to decide how this principle would operate if they were wanting,—whether we would compel an assessment, levy, and collection by the taxing district officials, and which of them would be selected by the court to perform the duty, etc. As it is, we have the assessment, we have an official to separately extend each levy on the collection book, and other officials to collect the tax. The judgment itself shows the aggregate amount required, and a simple calculation and the making of a certificate of the rate is all that the municipal authorities need do to accomplish the work. Their duty to make the certificate comes from the original grant of the taxing power, coupled with the general tax laws of 1881 and 1883, authorizing the certificate to be made, not by any specifically appointed officials, but by "cities and incorporated towns," implying, obviously, that the officials charged with the municipal government shall do this.

But certain special defenses are made in these causes that now require our attention. The legislature repealed the defendant's charter in 1879, the judgments here involved being at that time unsatisfied in this court. Acts 1879, c. 27, p. 41. In 1881 the formation of "taxing districts of the second class" was authorized, and under that act such a "taxing district" was organized for Brownsville, in 1883. Acts 1881, c. 127, p. 174. By these two acts "commissioners" were substituted for the formerly existing "mayor and aldermen," with all the usual authority, legislative, executive, and judicial, except the power to levy taxes, which was prohibited. But the act of 1879 especially enacted that nothing contained in it should impair the obligation of then existing contracts, and the act of 1881 "hereby levied" a tax of one dollar per hundred, one-half of which was to be applied to the current expenses, and the other to the old debts. Specific power was also given to one of the "commissioners," called the "secretary and financial agent," to assess and collect this tax. The general act of 1883, already noticed, relating to all tax-

ing districts, had been passed, but by an act of 1885 the act of 1881, relating to "taxing districts of the second class," was amended, and section 2 gives the commissioners the most ample power to levy taxes, and appropriate money to provide for the payment of "*all the debts* and current expenses of the districts." Acts 1885, c. 82, p. 162. It is apparent that, notwithstanding the general act of 1883, and its broad repealing clause, the legislature (or, rather, the authors of this legislation relating to Brownsville) considered the act of 1881 as wholly unaffected by it. But by a subsequent act of 1885, at the extra session, the full powers given under the former act of that year were taken away, or, rather, limited to the payment of the "compromise" bonds only; the evident object of the last act being to correct this careless blunder of a departure from the general plan of relief already fully commented upon. Acts Extra Sess. 1885, c. 10, p. 75.

A question was made at the bar whether this last act of the extra session could be made to fall within the terms of the governor's call for an extra session, as otherwise it would be unconstitutional. Const. Tenn. 1870, art. 3, § 9. We think it does. It was not the intention to require the governor to define with precision, as to details, the subjects of legislation, but only in a general way, by his call, to confine the business to particular subjects. *Mitchell* v. *Turnpike Co.*, 3 Humph. 455. Too great latitude of construction might, undoubtedly, abrogate the restriction of the constitution, but, on the other hand, a too rigid requirement in this regard would disastrously embarrass the executive and the legislature; since the former could never, with accuracy, foretell what the legislative mind would adopt as pertinent to the general subject, and therefore could not specifically define the provisions, or even the special character, of the forthcoming legislation, while the latter could not always, if ever, determine with accuracy what might or might not be of too remote affinity with the call. Besides, it would be conferring on the governor legislative powers never contemplated by the constitution, to permit him to restrict the legislature as to the details or character of its enactments. We think, therefore, notwithstanding the discrepancy between the call for legislation "to enable taxing districts to compromise their old debts," and legislation repealing former grants of power to levy taxes to pay them, that the act is not, in this regard, unconstitutional. The legislature and the governor might properly consider this repeal as a necessary means of reaching a "compromise." Acts Extra Sess. 1885, p. 7, where the call is printed; Id. c. 10, p. 75, where the act is printed.

The next question arises upon the defendant's objection that these judgments have not been revived by *scire facias* against the new corporation. We do not think this necessary. By section 15 of the act of 1881 the "taxing districts established under this act shall be known by the name of the town or city at the time the corporation became extinct." So there was no change at all, even of the corporate name, except from "town" or "city" to "taxing district" of Brownsville; and that section further provides that "all suits by or against said district shall be brought by or against the board of commissioners of the taxing district of

Brownsville." These judgments were obtained against, and stand in the name of, the "board of mayor and aldermen of the city of Brownsville."

It is conceded at the bar that a *mandamus* against designated officials operates, without *scire facias* or other revivor, against their successors in office, and that a change of *personnel* is immaterial; but it is urged that here there has been an extinction of the corporate defendant to the judgment, and that it is as if an individual defendant should die, when there must be a revivor against his administrator or other successor. This court has general power to issue the writ of *scire facias*, when applicable to its procedure, and the acts of congress provide against the abatement of pending suits by the death of parties; but we are not aware of any federal statute regulating the revivor of judgments, unless the process acts, giving the same remedies of execution as are known to the state laws, may be said to require us to follow the state practice in that regard. Rev. St. §§ 716, 916, 955, 956. But we do not find that the state statutes contain any special provisions different from the usual common-law procedure on this subject. General provision is made for the use of the *scire facias* to revive judgments upon the death of parties, (Thomp. & S. Code Tenn. §§ 2987, 2988; M. & V. Code Tenn. 3701-3704;) and against the abatement of all actions, which may be revived by *scire facias* or upon mere motion, according to circumstances, (Thomp. & S. Code Tenn. §§ 2845-2859; M. & V. Code Tenn. 3559-3570.) Among these provisions is one that, if the "decedent" has parted with his interest pending the suit, it may be revived against "his successor in interest," instead of the representative or heir.

For the obvious reason that a corporation is supposed to be substantially immortal, and that a mere change in the *personnel* of its management does not require any notice in legal proceedings against it, none of these statutes, state or federal, make any provision for the revivor of suits against "extinct" corporations, except that where the state proceeds to dissolve the corporation, a decree of dissolution shall not extinguish its debts, but the court appoints a receiver of its property to pay the debts; and, if dissolved for any cause, they shall continue to exist for five years for the purpose of prosecuting and defending suits against them. Thomp. & S. Code Tenn. §§ 1493, 3426; M. & V. Code Tenn. 1720, 4163. These provisions of the Code relate to *private* corporations, and are not applicable, perhaps, except as analogies, to public municipal corporations; but this court had occasion to consider them in relation to an extinct railroad corporation in *Kelley* v. *Mississippi Cent. R. Co.*, 1 Fed. Rep. 564, S. C. 2 Flip. 581, and there the somewhat false and misleading analogy to the death of individual suitors is suggested. It applies with greater force here, and comes of pressing too far the doctrine that a corporation, either private or municipal, has an existence independent of the persons who compose it. The "law provides heirs, executors, or administrators for dead persons; but an extinct corporation must be represented by the individuals who originally composed it." Id.

Now, here the population of the town of Brownsville, and all its accretions of individuals, from whatever source, constituted the munici-

pality known as the "town" or "city" or "board of mayor and aldermen" of Brownsville, and these same persons now compose the municipality known as the "taxing district" or "board of commissioners" of Brownsville. So, at most, we have only a change of name, and scarcely that, in relation to the *persons* sued, whatever may be said as to their *corporate* rights, powers, or liabilities. Indeed, the legislature itself, as above shown, enacts that the new corporation *shall be known by the same name;* and the change of designation, for the suable style, from "Board of Mayor and Aldermen of the City of Brownsville" to that of "Board of Commissioners of the Taxing District of Brownsville," is in itself not worthy of much consideration, even as a change of name. But a mere change of name for substantially the same party does not require a *scire facias;* and a *suggestion* of the fact upon the record is sufficient to meet the technical requirement that the execution and judgment must be consistent with each other, so that the record shall not stand with a judgment against A. and an execution against B., which is the only reason for any notice of the fact at all. *Harwood* v. *Law,* 7 Mees. & W. 206; *Penoyer* v. *Brace,* 1 Ld. Raym. 245; Fost. Sci. Fa. 99 *et seq.* The court said in *Bosanquet* v. *Ransford,* 11 Adol. & E. 520, that whether we proceed by *scire facias* or suggestion on the record depends on this point: "Whether new parties are to be introduced upon the record. The uniform course, if new parties are introduced, is by *scire facias.* Suggestion is applicable only to collateral facts, affecting the same parties; as, for example, change of name, etc., and similar matters." S. C. 2 Q. B. 972, and 39 E. C. L. 285. Mr. Foster sums up the cases by saying: "In accordance with the above decisions, where there has been *a mere nominal change of parties,* as in the public officer of a joint-stock company, the real party being the company, a suggestion on the record of such a change of the public officer has been held sufficient without *scire facias.*" Fost. Sci. Fa. 103. It was so ruled in *Webb* v. *Taylor,* 1 Dowl. & L. 676; Fost. Sci. Fa. 104, 106, *et seq.*

Hence we see that a revivor by *scire facias* is only required where new parties are to be charged with a liability. The reasoning of the above cases, there applied to such corporations as banks, etc., is more applicable to a mere change of municipal authority. It is true, no doubt, that these commissioners should be entitled to show any defense they might have to the judgments that could be pleaded to a *scire facias;* but because defenses may arise which might be available on a *scire facias* does not entitle a party to that writ. He may find it necessary to make the defense otherwise, for he is not entitled to a *scire facias,* except when the conditions of the case require that writ to issue, according to the practice. But a suggestion, as shown by the practice books, is traversable, and, if the facts upon which it is made be not true, it cannot be entered of record. Moreover, owing to the peculiar nature of a *mandamus,* it affords in itself ample opportunity to these commissioners to make any defense, by a return to the alternative writ or rule to show cause, that they can make to the *scire facias.* The court will not issue the writ peremptorily, if there be any reason, sufficient in fact or in law, against

it, and the pleading is of that character which affords the widest scope for any defense available in any way. More entirely, therefore, here, than in any other cases, as where the *fieri facias* or some like writ of execution issues, is the rule requiring a *scire facias*, upon change of parties, based upon the purely technical demand that the writ and the record shall consistently conform to each other. We do not find the precise point of practice determined, but we doubt if this reason of the rule requiring a *scire facias*, or a suggestion of record for that purpose before a *fieri facias* can issue, applies at all when the writ of execution takes the form of a *mandamus*, because of the essential difference in the forms of the two writs.

This is not, however, very important, as we hold that a bare suggestion, which may be now made of record, is all that is required. This suggestion need only state that, by subsequent legislation, the suable style of the defendant corporation has been changed from that which appears in the face of the judgment to that required by the new legislation. If this be done, the record is entirely consistent with any writ that may issue on the judgment, whether *fieri facias* or *mandamus*, and this is all that the practice seeks to accomplish in such cases. It is the same party, by a different name, sought to be charged, namely, the inhabitants of Brownsville, in their corporate capacity; not any new party. Hence no *scire facias* is necessary. And, since a *mandamus* may issue against individuals who may not be parties to the judgment, conformity to the judgment in names is not always either possible or necessary. Manifestly, we get those parties from the preliminary petition or affidavit upon which the *mandamus* is to be founded, and they may be the names of any persons whatever who are charged with the duty sought to be enforced. When they answer as individuals, they can set up any defense, either in their own right or as the representatives of the defendant corporation.

Although there was a *scire facias* in *O'Connor* v. *Memphis, supra,* the court clearly recognizes that a suggestion on the record of the change of name may be the proper form of proceeding. 6 Lea, 731.

If *Greeley* v. *Smith,* 3 Story, 657; *Mumma* v. *Potomac Co.,* 8 Pet. 281; *The Sapphire,* 11 Wall. 164; and *Thompson* v. *U. S.,* 103 U. S. 480,— have any application, they support, and do not conflict with, the ruling we make.

Whether the inhabitants of the "city" of Brownsville, who in their corporate capacity contracted these debts, with a power conferred of paying them by local taxation, and whom the law still compels to pay them by the exercise of that power, were a different corporation from that same body of inhabitants who are now incorporated as the "taxing district" of Brownsville, or whether the old corporation be "dead," and a new one "arisen" as its "successor," or whether both be the same, under different names, are questions pertaining more to the metaphysical doctrine of "psychopannychism," if that can be adapted to corporations, which are said "to have no soul," than to the practical science of legal procedure.

The next defense set up is that one of the judgments is barred by the

statute of limitations, it having been more than 10 years from the date of the judgment to the suing out of this *mandamus*, although other like writs have issued in the mean time. If the time elapsed between the repeal of the charter and the reorganization into a "taxing district," during which there was no organization to be sued, be excluded, the 10 years have not expired, and the bar has not attached. We have no hesitation in holding that it should be excluded, precisely as the time occupied by our late war was excluded, and for precisely the same reason. If a state, with the deliberate and confessed purpose of doing that, repeals the charter of a municipal corporation to enable it to evade or avoid the writ of *mandamus* to enforce judgments against it, thereby disable the plaintiff from proceeding in the case, the time of disability should not be computed in the period of the statute of limitations. We are aware of the stringency of the rule that courts will not ingraft upon the statute exceptions growing out of mere equitable considerations of hardship or injustice, and the only doubt we have is whether the plaintiffs here are not put to a bill in equity to perpetually enjoin the defendant corporation from pleading the statute, as one might be for relief against any fraudulent contrivance of a defendant to arrest or delay the plaintiff's proceeding against him. But since the act of arrest complained of here is that of the state itself, by its own legislation, and through its paramount authority, which none can resist, we find no difficulty in implying from the new legislation and governmental conduct of the state an intention to exclude the time of disability from the statute, as is done in case of war. *Hanger* v. *Abbott*, 6 Wall. 532; *U. S.* v. *Wiley*, 11 Wall. 508, 513,—where it was ruled that although the *right* to sue was unimpaired, the "loss of the ability to sue, rather than the loss of the right, stops the running of the statute." And in *Braun* v. *Sauerwein*, 10 Wall. 218, where the limitation was suspended by the operation of an act of congress, just as we think this legislation operates, Mr. Justice STRONG remarks of the decisions:

"They all rest on the ground that the creditor has been disabled to sue, by a superior power, without any default of his own, and therefore that none of the reasons which induce the enactment of the statutes apply to his case; that, unless the statutes cease to run during the continuance of the supervening disability, he is deprived of a portion of the time within which the law contemplated he might sue."

There are other applications of the doctrine quite as familiar, as in cases of delay pending appeals. *Montgomery* v. *Hernandez*, 12 Wheat. 129. 134. Moreover, this proceeding by *mandamus* is, in its constituent elements and its frame-work, capable of supporting even an equitable defense against the statute. Ang. & A. Corp. (11th Ed.) §§ 715, 721, 729; High, Extr. Rem. (2d Ed.) §§ 14, 457, *et seq.* The court does not grant or refuse the writ upon purely legal considerations. If the defendant has any equitable defense against it, he may set it up in his answer to the rule to show cause or alternative writ, and it will authorize the court to refuse the peremptory writ. So, if he sets up a legal defense, and the plaintiff can show an equitable answer to it, we see no reason

why the legal defense should prevail to obstruct the writ. Therefore we might issue this writ, notwithstanding the bar of the statute, if it be inequitable for the defendant to set it up. But by this we mean only such an equitable defense as would authorize a court of equity to relieve against the bar by its injunction, and not cases of mere hardship.

The next matter for consideration is the character of relief to be granted to the plaintiffs; and there are complications in the case which are perplexing, so much so that one of these petitions was originally filed as a bill in equity, but, under the orders of the court, was converted into an application for *mandamus*, for reasons that are obvious in the record. Under former writs, as to some of these judgments, taxes were levied, partly collected, and paid over. Some of these levies were commingled with other judgments from this and the state courts, one rate being intended to cover all, and now we are asked to compel another levy for the unpaid balance.

We have repeatedly held in this court that where a levy has been made sufficiently large to cover the judgment, with a reasonable allowance of margin for delinquencies, we would not compel a further levy for inadequacy until all the remedies afforded by law against delinquent tax-payers and their property had been exhausted. Otherwise the burden would be always placed wholly upon the prompt tax-payers, and levies, out of all proportion to the needs of the case, would be piled up, to go into the general fund, or be never collected. We adhere to this now; but the peculiarities of this case present, we think, an exception, unless the defendant shall, by its return to the writ, present facts that will bring the case within the ordinary ruling. It appears that there is no statutory receiver, as there was in the *Memphis Case*, to collect the delinquent taxes of the "extinct" corporation, and it is stated that not even can the old tax-books be found, and the facts concerning the condition of the levies are not known. A receiver was authorized by the legislation, and one of the governors of the state appointed one, but, yielding to the hostile pressure of public opinion, and the difficulties of giving bond, he declined to qualify. Subsequent governors have neglected or refused to appoint a receiver, and no provision has been made, in the administration of affairs, for the collection of those levies. Obviously, we cannot compel the governor to appoint a receiver,—or we do not wish, at least, to attempt that,—and this court long since intimated that it would not do so, as it would be nugatory, in all probability. High, Extr. Rem. (2d Ed.) § 14. Nor could we compel a person to accept or qualify as receiver, if appointed. Therefore we think that, for the purposes of this case, the defendant corporation, and the state itself, may be held to have abandoned the levies heretofore made, and the creditors likewise; that it is thus demonstrated that the levies were inadequate to satisfy the judgments; and that the case stands as if it had been shown that the levies had been wholly exhausted, leaving a balance unpaid.

It is next insisted by the plaintiffs that since the legislature, by the act of 1881, levied a tax of one dollar, enacted that one-half of it be

paid upon the old debts, and provided the machinery for its collection, we should now compel that tax to be collected for each year that has transpired since the act was passed. As to this, it is to be observed that the act was a general one, applying to all "taxing districts" of the second class, and Brownsville was not organized as a taxing district for nearly two years afterwards; that being the time we have already excluded from the computation on the statute of limitations. Therefore it can scarcely be said to have been, as to Brownsville, a subsisting levy while the municipality was disorganized, and not rehabilitated under this act. If it came into force, as a levy, upon reorganization, that did not take place, we infer, until about the time the legislature again met, and changed the law, if it did not occur afterwards. The general act of 1883, already largely noticed, applied to all taxing districts, and contained, as stated, a broad repeal that perhaps, in itself, abrogated this former tax under the act of 1881; but the denizens of Brownsville did not seem to recognize this, for in 1885 another act, applicable to Brownsville, amended the act of 1881, repealed the former tax, and gave to the "taxing district" itself the largest powers of taxation for all purposes, even to pay "old debts;" which evident blunder, however, was speedily corrected by the extra session act of the same year, and the special legislation relating to Brownsville was brought in harmony with the general scheme, already explained, whereby the municipalities were prohibited from exercising the taxing power, except to pay the *compromise* bonds in default of levies by the legislature, etc. Moreover, the general tax acts already referred to, providing a single assessment for all purposes, and directing how county and municipal taxation should be accomplished, when authorized, of themselves, by their repealing clauses, abrogate all the foregoing special methods for Brownsville.

Now, these revocations of the taxing power under the act of 1885, and the repeal of the legislative levy under the act of 1881, are not, either of them, affected by the federal constitution; because, being subsequent to the contracts upon which these judgments were founded, they did not enter into, and become a part of, the remedy. Wherefore they were within the control of the legislature. So that, whether we consider the one or the other, they no longer exist as a basis for the coercive payment of these judgments through the operation of a *mandamus*.

But there is still another reason why we cannot proceed under the act of 1881. It may be doubtful, under the ruling of *Lynn* v. *Polk*, 8 Lea, 135, whether the legislature can levy a continuing tax beyond the two years for which it is elected, and whether that is not the utmost limit of its authority, under the state constitution. But we need now express no opinion on that point. It is well settled that, whatever be the power of a legislature in that regard, such levies are not favored, nor raised by implications and constructions of the statute. The intention to make a tax continuing or permanent must be clearly manifested by explicit enactment, otherwise the courts favor the principle of periodical levies, whereby the taxation is scrutinized in the constantly recurring assemblies of newly-elected representatives. *U. S.* v. *Wigglesworth,* 2 Story, 369; *Adams* v.

v.29F.no.15—48

*Bancroft,* 3 Sum. 384; *Wilkinson* v. *Greely,* 1 Curt. 439; Cooley, Tax'n, 202; 1 Desty, Tax'n, 102, 138; 2 Desty, Tax'n, 1055; Burroughs, Tax'n, 194, 554.

There is no such explicit manifestation of an intention to levy a permanent tax of one dollar, by the act of 1881, as is implied in the application to now enforce it against the taxing district of Brownsville, which was organized after the two years to which the levy would certainly apply.

The general result is that the plaintiffs are left to the same remedy that we applied in the *Memphis Case,* and they can have a writ only to that extent, unless the defendants, by their answer to the rule, show some better defense than has been suggested by their demurrers to the petition. We need not say, of course, that we cannot enforce any judgments of the state courts, and that as to these the petition will be denied. If the parties cannot agree as to any credits to be entered upon the judgments, that disagreement must be settled before the *mandamus* can issue, and, if desired, the clerk may, upon a reference, report the facts to the court, and the balances due. Some of these defenses would perhaps be more appropriate in an answer to the rule to show cause; but, on the demurrers to the petition, we take it, the defenses may be presented, and we have thought best to settle the case, so far as can be done, but without prejudice to the defendants to make any defense desired by response to the rule.

I am authorized to say that these were the conclusions reached by the court at the hearing, and that the circuit judge fully concurs in this opinion. Counsel will prepare the necessary orders. So ordered.